**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO
ALBUQUERQUE DIVISION**

**MARK STAAKE,**

     **Plaintiff,**

**v.**                         **CASE NO.  1:15-cv-00715-MCA-WPL**

**FNU BARRELA, et al.,**

     **Defendants.**

## THE *MARTINEZ* REPORT BY DEFENDANTS CORIZON HEALTH, INC., JASON DURAN, TAMMY RUSH, DR. CLAUDIO PEREZ, AND CHRISTOPHER BARELA

**NOW COME**, Defendants Corizon, LLC, Jason Duran, Tammy Rush, Dr. Claudio Perez, and Christopher Barela, by and through their attorneys of record, Chapman and Charlebois, P.C. (Nicole Charlebois), and respectfully submit this *Martinez* Report, pursuant to the Court's Order of October 18, 2016. (Doc. 53.)

### INFORMATION REQUESTED

The Court requested the identification and production of all relevant policies, regulations, and records as part of the *Martinez* Report. (Doc. 53, p. 2.) Once all records, including over three hundred pages of medical records, were gathered, this would constitute a document production of over seven hundred pages with the *Martinez* Report, which is far beyond what this Court generally contemplates or expects. To prevent burdening the Court with such a production when unnecessary, Defendants list in the chart below all identified relevant records. Those identified have been reduced to only those relevant.

1. A written Memorandum addressing Plaintiff Mark Staake's claims, which follows this Section.

2. Records pertaining to the allegations that exist.

3. Policies and regulations addressing the allegations that exist.

4. Attached, are true and correct copies of the records, policies, and regulations, responsive to paragraphs 1 and 2, properly authenticated through sworn Declarations.

| Exhibit | Document |
|---------|----------|
|         |          |
| 1       | **The Declaration of Dr. Claudio Perez-Ledezma** |
| 1-A     | The Medical Record of Plaintiff Mark Staake from Doña Ana County Detention Center ("DACDC")<br><br>[Defendants have removed duplicate or unnecessary records, but will supplement if requested. Defendants have provided a full copy to Plaintiff] |
|         |          |
| 2       | **The Declaration of Jason Duran, Health Services Administrator for Corizon Health, Inc.** |
|         | The Authenticated Corizon Polices in Effect at DACDC |
| 2-A     | Credentials |
| 2-B     | Clinical Performance Enhancement |
| 2-C     | Professional Development |
| 2-D     | Medication Administration Training |
| 2-E     | Staffing |
| 2-F     | Orientation of Health Care Staff |

| | |
|---|---|
| 2-G | Grievance Mechanism for Healthcare Complaints |
| 2-H | Access to Care |
| 2-I | Pharmaceutical Operations |
| 2-J | Medication Services |
| 2-K | Diagnostic Services |
| 2-L | Hospital and Specialty Care |
| 2-M | Non-formulary Request Process |
| 2-N | Director of Nursing Job Description |
| 2-O | Contract<br><br>[Select portion of the Corizon-DACDC] |
| 3 | **The Declaration of Christopher Barela** |
| | The Authenticated Relevant DADCD |
| 3-A | Plaintiff Mark Staake's Booking Jacket from DACDC |
| 3-B | Plaintiff Mark Staake's Select Portion Kiosk Records from DACDC |

## MEMORANDUM DISCUSSING PLAINTIFF'S CLAIMS

Incarceration does not constitutionalize medical malpractice. Over the two years he remained at DACDC, Plaintiff received a near constant supply of analgesic medication – including medication he specifically requested – for his chronic lower leg

3

pain and a dozen evaluations of a minor skin rash. Under this course of care, he walked without limp, impairment or assistive device, and his rash vanished. Plaintiff suffered no injury. Without injury, Plaintiff cannot demonstrate negligence, much less deliberate indifference under the Fourteenth Amendment.

## I.    The Factual Background to this Suit

### A. The allegations contained in Plaintiff Mark Staake's Complaint.

This case arises from the medical care that Plaintiff received while incarcerated at the Doña Ana County Detention Center ("DACDC") for chronic lower leg pain and allergic dermatitis as a pretrial detainee. (Doc. 1, Pl.'s Compl. ¶ 3.)

*Chronic Lower Leg Pain.* There are three failures which Plaintiff identifies concerning the treatment he received for chronic leg pain. First, he claims that a nurse practitioner ended pain medication he had received for eight years when he first arrived at DACDC. Second, he was denied a theraband to exercise his leg, resulting in atrophy and pain. Third, he argues the providers switched his medications or fail to dispense them properly, resulting in pain and side effects. (*Id.* ¶ 37.)

*Allergic Dermatitis.* In October 2013, Plaintiff claims that maintenance to the showers in his unit caused a chemical burn. While he admits a cotton blanket (as versus wool) helped, none of the other treatment provided by the medical staff improved the rash and medical refused to send him to a dermatology appointment despite court order. (*Id.* ¶ 38.)

Based on these allegations, Plaintiff has sued all of the defendants in their individual and official capacities. (*Id.* ¶ 4.) His claims can be categorized:

4

1. <u>Federal Law Claims</u>: Defendants Corizon, Barela, Rush and Dr. Perez violated the Eighth and Fourteenth Amendment directly. (*Id.* ¶¶ 39-42.) In addition, Corizon, Barela, Rush and Duran failed to adequately train, credential, hire, supervise the medical staff and, furthermore, failed to intervene when they learned of the medical staff's deliberate indifference. (*Id.* ¶¶ 57-66.)

2. <u>State Law Claims</u>. Corizon, Barela, Rush, and Duran committed medical malpractice; negligently trained, hired, supervised, or credentialed the medical providers. Corizon, Barela, and Rush, also committed negligence, ordinary perhaps, and negligence *per se* "in the provision and supervision of medical staff." (*Id.* ¶¶ 42, 44, 49-56.)  Finally, Plaintiff contends that Corizon and Barela breached the contract to provide appropriate medical services. (*Id.* ¶¶ 67-70.)

**B. Plaintiff received extensive medical care after arriving at DACDC.**

Dr. Claudio Perez-Ledezma ("Dr. Perez") was the Site Medical Director at DACDC beginning June 2014. He has reviewed Plaintiff's entire medical record at DACDC. (Ex. 1, Perez Decl. ¶¶ 2-3.) Plaintiff entered DACDC on January 19, 2013, after arrest in Vermont. (Ex. 3, Barela Decl., Ex. 3-A, Booking Jacket, p. 43.) During intake, he reported allergies to wool, which caused a rash, and certain anti-inflammatory medications which caused hives, rash, and shortness of breath. He also reported an extensive knee injury and fractures with hardware repair in his left ankle and jaw. (Ex. A-1, Medical Record ("MR") pp. 2, 3, 6, 22-23.) But Plaintiff walked without a limp and did not need any assistive devices, such as a cane. (*Id.*)

5

Plaintiff also arrived with a prescription of amitriptyline (Elavil), a tricyclic antidepressant, so the nurse contacted Nurse Practitioner ("NP") Vargas, the on-call mental health provider. NP Vargas ordered a short term prescription of Elavil, pending documentation from Vermont confirming the prescription. (*Id.* pp. 50, 186.) That day, Plaintiff requested mental health treatment due his history of head trauma and Elavil 100 mg at bedtime. He followed up on January 21. On January 22, 2013, RN Tammy triaged Plaintiff's first request and referred him for an appointment. (*Id.* pp. 50, 56.)

Thus, on February 1, 2013, a mental health provider saw Plaintiff during rounds. He was upset that he had not received Elavil, his pain medication. Although an antidepressant, Elavil is also used for chronic pain management. (Ex. 1, Perez Decl. ¶ 34.) In another request, Plaintiff explained he took the medication for neuropathy, not mental health. RN Rush referred the patient for medical evaluation on February 4, 2013, (Ex. 1-A, MR. p. 194), but Plaintiff left DACDC for court in Bernalillo County. (Ex. 3-A, p. 43.) When he returned, NP Walden started Plaintiff on Dantrium, a muscle relaxer for spasms, on February 23, 2013. (Ex. 1-A, MR p. 57.)

On March 5, 2013, Plaintiff attended sick call. NP Garcia evaluated his lower legs and noted several scars and swelling. Plaintiff reported taking Elavil for chronic pain management due to multiple traumas, including leg and jaw fracture. Plaintiff explained that after trial and error, previous medical providers had determined that Elavil and Baclofen, another muscle relaxant, worked well to control his pain. NP Garcia prescribed Baclofen 20 mg, one tablet twice daily, and Elavil 50 mg at bedtime. (*Id.* pp. 23, 183-85.) NP Garcia also authorized an extra blanket to elevate his lower left leg and foot and encouraged Plaintiff to return if needed. (*Id.* pp. 23, 191.) Roughly two months

later, on April 30, 2013, NP Garcia increased the Baclofen to 40 mg twice daily and the Elavil to 100 mg each evening. (*Id.* pp. 180-81, 183-85.)

On May 29, 2013, a nurse performed a review of Plaintiff's current health status and needs. (*Id.* pp. 15-20.) Plaintiff confirmed his history of ankle and jaw fracture and a chainsaw accident to his left leg. (*Id.*) Plaintiff also confirmed an allergy to Naprosyn and Aleve which caused hives and rash. (*Id.*) After addressing other matters, the nurse noted that Plaintiff did not have any mobility restrictions or the need for an assistive device. (*Id.* p. 18.) Plaintiff signed off on the evaluation. (*Id.*) This same day, NP Walden adjusted Plaintiff's medications due to complaints of pain and prescribed Plaintiff an extra towel. (*Id.* p. 190.) By May 30, 2013, she had Plaintiff on 40 mg Baclofen twice a day, and also started ibuprofen 400 mg, twice daily. (*Id.* pp. 179-83.) NP Walden renewed Baclofen on June 29, 2013. (*Id.* pp. 179-80.) He remained on Elavil. (*Id.* p. 183.)

From June 6, 2013, until July 12, 2013, Plaintiff left DACDC for Bernalillo County. (Ex. B-2, Booking Jacket pp. 42-43.) On July 15, 2013, Plaintiff asked NP Walden to renew Baclofen because it was effective. (*Id.* p. 46.) His prescription was already in effect. (*Id.* p. 180.) Later, on August 1, NP Garcia renewed Elavil, 100 mg each evening. During an appointment on August 5, however, Plaintiff told NP Garcia Elavil had been moderately effective, but he would like it increased. NP Garcia increased Elavil to 125 mg each evening. (*Id.* pp. 46, 176-79.)

On August 15, 2013, NP Walden saw Plaintiff for his request for therapy bands to strengthen his lower left extremity. (*Id.* p. 45.) Plaintiff explained he had been prescribed the bands while at Las Lunas Correctional Facility. Medical staff previously requested

this information from Las Lunas without any response. NP Walden directed a nurse follow up on Las Lunas, which she did on August 16, 2013. (*Id.* pp. 45-46.) On August 28, 2013, NP Walden continued the Baclofen prescription. (*Id.* pp. 176-79.)

On September 12, 2013, NP Walden followed up with Plaintiff concerning the therapy bands. She explained to Plaintiff that Las Lunas failed to respond to multiple requests for information. Prior to the appointment, she had discussed safety and security issues concerning the bands with DON Duran, who agreed that they were not essential for inmate care at this time. (*Id.* p. 43; Ex. 2, Duran Decl. ¶ 10.) Plaintiff walked with a steady and upright gait. (Ex. 1-A, MR p. 43.) He had no indication of muscle weakness in his lower left leg that required additional specialized physical therapy modalities.  Plaintiff denied additional pain medication needs. (*Id.*; Ex. A, Dr. Perez Decl. ¶ 16.)

On September 19, 2013, a nurse scheduled Plaintiff with a provider when he requested another increase in his analgesic medication. (Ex. 1-A, MR p. 42.) NP Walden evaluated Plaintiff four days later, but he could not describe why he needed more pain medication. His dose of Elavil already exceeded the recommended dose for neuropathic pain. Plaintiff asked for Parafon Forte, another medication for muscle spasms. After further discussion with NP Walden, though, Plaintiff opted to continue with the current medications. He also requested an extra mattress for strength training, but he already had an extra towel for this. After NP Walden explained the extra mattress criteria, Plaintiff denied any further needs. (*Id.* p. 42.)

On October 1, 2013, Dr. Vaquera, the prior Medical Director, evaluated Plaintiff when he reported trouble receiving the full 125 mg of Elavil. (*Id.* p. 41; Ex. 1, Dr. Perez

8

Decl. ¶ 19.) After discussing different dosing options, Plaintiff became agitated and angry with Dr. Vaquera. (*Id.*) Later, on October 16, NP Walden followed up with Plaintiff on his complaints and then addressed the issue with the pharmacy to ensure he received a full 125 mg. (Ex. 1-A, MR p. 40.)

On October 26, 2013, LPN Abeyta evaluated Plaintiff during nursing sick call. The nurse noted that Plaintiff had a redden rash all over his body. He reported that the rash, with itching and burning, began one month before. Currently, it caused slight pain of two out of seven. At its worst, Plaintiff judged the pain at seven out of ten. Plaintiff reported showering, although not daily, and bathing made the rash worse. Abeyta performed a wool allergy skin test which was negative. Plaintiff denied any change in his diet. Abeyta provided Plaintiff hydrocortisone 1%, to apply for seven days and referred him to provider sick call to reassess rash. (*Id.* pp. 23, 39, 54-55, 176-77.)

Two days later, on October 28, NP Berumen evaluated Plaintiff. Plaintiff reported that something in the water that he drank or in the showers caused the rash. NP Berumen could not detect any rash or lesions at this time. Plaintiff scratched, and his skin was irritated. Although NP Berumen tried to explain to Plaintiff that he did not have a rash, Plaintiff did not seem to understand. (*Id.* p. 39.)

On November 3, 2013, NP Walden continued Elavil. (*Id.* pp. 173, 176.) On November 6, 2013, Dr. Vaquera evaluated Plaintiff due to his report of a burning sensation to his chest, back, and face over several weeks, from water. (*Id.* p. 38.) Dr. Vaquera noted a mild redness to Plaintiff's face, chest and back, dry to touch, itchy, with signs of scratching. He diagnosed dermatitis, possibly chemical in origin such as a change in laundry detergent, water softening, or chloride purification. He prescribed

hydrocortisone cream and Vistaril, used as an antihistamine. (*Id.* pp. 38, 176; Ex. 1, Dr. Perez Decl. ¶ 24.)

On November 23, 2013, RN Baeza attempted to evaluate Plaintiff for a skin infection at nursing sick call. Plaintiff argued aggressively, raised his voice, and stood up, when Baeza tried to interview him. Baeza examined the area Plaintiff identified – his chest – but did not see any rash, macules papules, or raised areas of his skin. Plaintiff wanted a referral to a dermatologist. He became offensive and would not let the nurse speak. An officer had to enter due to his escalation, and Plaintiff was asked to leave the exam room. The nurse referred Plaintiff for further evaluation.  (Ex. 1-A, MR p. 37.)

Three days later, NP Walden evaluated the patient. Plaintiff told NP Walden that his lawyer advised him to get a referral to a hospital to see a dermatologist for skin burns from the water. Plaintiff indicated that the water burned the hair off of his ankles under his sweat socks. He also reported burns on his face, cheeks, and chest. He did not think that the hydrocortisone cream was effective. On evaluation, NP Walden noted that Plaintiff's ankles were white but hairless to top of his socks where normal hair growth resumed. She did not see any indications of rash, burn, acne, abrasions, bruises, or lacerations on his face, cheeks or ankles. The skin was healthy appearing and appropriately toned. She did note a fine pink scattered sandpaper-like raised rash on Plaintiff's chest, typical of very mild contact dermatitis. She diagnosed mild dermatitis to an unknown allergen as in prior evaluations. (*Id.* p. 36.)

NP Walden explained to Plaintiff that ankles frequently lose hair from sweat socks, although he insisted the water did it. She also explained that his face looked clear without any abnormalities whatsoever and the rash on his chest appeared to be an

allergic reaction or contact dermatitis. NP Walden offered to prescribe a stronger steroid cream called Kenalog, but he refused, insisting that the rash was a burn. NP Walden advised Plaintiff that he would only be referred to specialists either in life-threatening emergencies or if the issue could not be resolved in-house. Plaintiff continued to refuse the stronger steroid. NP Walden offered a mental health referral to Plaintiff to discuss his concerns, but he declined. NP Walden advised Plaintiff to contact healthcare if he wanted to try a stronger cream or re-discuss the issue. Plaintiff stated he was only here for his lawyer.  (*Id.*)

Dermatitis is an inflammation of the skin. It is a very common, transient, and non-serious condition that is easily treated with over-the-counter medications. (Ex. 1, Perez Decl. ¶ 27.)  Mild contact dermatitis is a harmless reaction to exposure to a substance such as a new detergent or skin care product. The skin becomes red, irritated, and itchy. In this case, NP Walden and Dr. Vaquera suspected the patient suffered a mild allergic reaction, easily resolved with steroid cream. In Dr. Perez's professional judgment, the symptoms which these providers noted are consistent with contact dermatitis, not a chemical burn. (*Id.*) First, a chemical burn would present like a sunburn: red, peeling skin, with swelling. Second, if a chemical in the shower was strong enough to burn the hair off Plaintiff's ankles, it would cause skin damage and removed hair off other areas of his body. (*Id.*)

On November 26, 2013, NP Walden renewed Plaintiff's Baclofen. (Ex. 1-A, MR pp. 171, 173-75.) On December 6, 2013, NP Berumen evaluated Plaintiff. He noted that Plaintiff had a normal gait. He saw a fine macular erythematous (red) rash to the anterior aspect of Plaintiff's chest. Plaintiff reported that the rash was uncomfortable and

itchy over the last several days. NP Berumen did not see symptoms of infection or drainage, and Plaintiff's breathing sounds were normal. NP Berumen diagnosed allergic dermatitis and prescribed prednisone and a topical cream. (*Id.* pp. 35, 174.)

On January 11, 2014, Plaintiff refused clinical services. (*Id.* p. 231.) On February 4, 2014, NP Walden prescribed Elavil 125 mg. (*Id.* pp. 167, 169-71.) She then renewed his Baclofen. (*Id.* pp. 167, 169-72.) Plaintiff refused another evaluation of his skin on March 19, 2014. (*Id.* pp. 34, 230).

On May 4, 2014, Plaintiff's Elavil prescription expired. Due to difficulty with supply, NP Walden started Plaintiff on a very similar medication, nortriptyline 50 mg, two tablets at night time. (*Id.* p. 167; Ex. 3-B, Kiosk Records, p. 65.) Nortriptyline is Pamelor, a tricyclic antidepressant like Elavil, also used for chronic pain management. These drugs are usually interchangeable: patients will receive comparable results on either medication. At the time, Pamelor was on the formulary, while Elavil was not. Formularies are used by hospitals and other medical entities to establish a set of medications available to be prescribed without prior approval. Providers could go off formulary, but it required a further approval step. NP Walden's decision to change Plaintiff's medication from Elavil to Pamelor was a reasonable choice. He should have experienced an equally effective response. (Ex. 1, Perez Decl. ¶ 34.)

On May 7, 2014, Plaintiff reported to NP Berumen that Pamelor did not work on his leg pain. NP Berumen explained that he would continue Pamelor for thirty days to see whether Plaintiff experienced an improvement. (Ex. 1-A, MR p. 33.) Tricyclic antidepressants are not like narcotics – it takes several weeks to experience the full

analgesic effect. (Ex. 1, Perez Decl. ¶ 35.) But Plaintiff was unwilling to try Pamelor. Starting the next day, he refused the medication. (Ex. 1-A, MR pp. 227, 229.)

On May 12, 2014, Plaintiff advised NP Walden that Pamelor did not help him sleep as well as Elavil did. NP Walden explained that Pamelor was in the same class of medications and should have an equivalent effect as Elavil. She also noted that the medication was prescribed to address the chronic pain in his lower left extremity, not for sleep. Plaintiff complained that Pamelor caused heart burn. NP Walden offered to increase the dose of Pamelor and provide antacids. She explained that the only way the providers could determine whether Pamelor was effective was if Plaintiff took the medication regularly. Plaintiff agreed to an increase in medication with Tums. (*Id.* p. 33.) NP Walden increased Pamelor to 150 mg by mouth every evening and prescribed Calcium Carbonate for dyspepsia. (*Id.* p. 167.) But on May 18, Plaintiff again refused Pamelor. (*Id.* pp. 221, 223-25.)

On May 27, 2014, NP Beruman evaluated Plaintiff. Plaintiff reported that Pamelor did not resolve his pain and caused side effects such as insomnia. (*Id.* pp. 32, 167.) Plaintiff reported his pain level was now seven out of ten. He wanted Elavil. NP Beruman cancelled Pamelor and restarted Elavil, 100 mg in the evening. (*Id.* pp. 32, 163, 165, 167.) During this time, Plaintiff remained on Baclofen. (*Id.* pp. 163, 165, 168.)

On May 29, 2014, a nurse performed another annual evaluation of Plaintiff's health needs and status. (*Id.* pp. 9-14.) Relevant here, she noted that Plaintiff did not have mobility restrictions or a need for assistive devices. (*Id.* p. 12) His physical examination was normal, including his extremities. (*Id.* pp. 13-14.) She examined Plaintiff's skin and did not see any indications of rash, infection, or abscesses. Plaintiff

signed off on the evaluation as accurate.  (*Id.* p. 14.) On June 2, 2014, Plaintiff refused

sick call as he did not need additional chronic pain medications. (*Id.* pp. 31, 222.)

In June 2014, Dr. Perez became the Medical Director. (Ex. 1, Perez Decl. ¶¶ 2-

3.) A month later, on July 25, 2014, the state court ordered DACDC to transport Plaintiff

to Memorial Medical Emergency Room for an independent medical evaluation. (Ex. 1-A,

MR p. 189.) This was scheduled for August 13. (*Id.*) On August 8, 2014, a nurse

performed another wool allergy test on Plaintiff, but his skin did not react. (*Id.* p. 31.)

On August 13, 2014, Plaintiff went to Memorial Medical Center for evaluation. (*Id.*

pp. 196-205.) At the hospital, Plaintiff related that he had been burned in the shower

over a year before and had experienced a recurrent rash since then. He wanted

evaluation outside of the detention center because the treatment provided by the facility

medical staff had not improved his condition. (*Id.* p. 197.) When a nurse evaluated

Plaintiff's skin, she noted that he had normal skin color. She found the skin warm, with

normal moisture, intact, and without rash. (*Id.*)

The emergency room physician, Dr. Jose Perez-Ledezma, also evaluated

Plaintiff.[1] Based on Plaintiff's history, Dr. Perez-Ledezma thought his condition was

consistent with a self-limited urticarial problem. Urticaria is the medical term for hives.

Self-limiting means that the hives are not serious, do not progress, and resolve on their

own. (Ex. 1, Perez Decl. ¶ 47; Ex. 1-A, MR p. 197.)  The common cold is an example of

a medical condition that is self-limiting, resolving without treatment. (Ex. A, Perez Decl.

¶¶ 46-47.) The physician noted that the rash did not have an obvious trigger, such as

pets, drugs, or hypersensitivity. He also ruled out symptoms that indicated the allergic

---

[1] This Dr. Perez-Ledezma is Dr. Perez's late brother. (Ex. 1, Dr. Perez Aff. ¶ 47 n.1.) He happened to be
the attending physician at Memorial on August 13, 2014. When Plaintiff went to Memorial, Dr. Perez had
not been involved in his care. (*Id.*)

14

reaction was progressing, such as upper airway stridor, loss of voice, trouble swallowing, nasal congestion, fever, chills, sweat, conjunctivitis or chest pain. Plaintiff himself rated his symptoms as merely annoying. The physician noted that the skin rash was limited to exposed areas only. (Ex. 1-A, MR p. 197.)

On evaluation, the physician noted that Plaintiff appeared comfortable, was not in distress, and did not appear ill. (*Id.* p. 198.) He conducted a full physical examination and noted Plaintiff's skin color was normal without rash at that time. (*Id.*) The physician did not find his family history significant and all relevant signs and symptoms were negative. (*Id.*) He discharged Plaintiff in a stable condition. (*Id.* p. 199.) The discharge diagnosis was allergic urticaria and rash – hives brought on by an allergic reaction. (Ex. 1, Dr. Perez Decl. ¶ 47; Ex. 1-A, MR pp. 201, 204.) Dr. Perez-Ledezma recommended that Plaintiff follow up with Dr. Ono, a local dermatologist, but did not prescribe any medication or other treatment. (Ex. 1-A, MR p. 200.)

On August 27, 2014, NP Berumen started Plaintiff on Flexeril 10 mg, twice daily as Baclofen had been removed from the formulary. Flexeril is a muscle relaxer equivalent to Baclofen. (*Id.* pp. 161, 163; Ex. 3-B, p. 92.) Plaintiff objected because he did not think Flexeril worked and wanted Baclofen instead. (Ex. 1-A, MR p. 220.) On August 29, 2014, NP Walden noted the diagnosis of allergic utlcaria from the ER visit. At this time, Plaintiff had been evaluated by three different providers at the jail, but he refused recommended treatment. NP Walden scheduled Plaintiff to see the Medical Director, Dr. Perez. (*Id.* p. 30.)

On September 11, 2014, Dr. Perez evaluated Plaintiff for the first time. (*Id.* p. 29.) The rash, Plaintiff explained, occurred on the chest area and lower extremities,

beginning twelve months before. He denied pruritus (itchiness) or any alleviating factors. Wool blankets and hot water exacerbated his condition. (*Id.*) Also, Plaintiff threatened legal action over the change in his medication from Baclofen to Flexeril. (*Id.*) He would not cooperate for examination. Dr. Perez noted macular erythema (small red spots) on Plaintiff's chest and right lower leg with some mild papules (small raised bumps) on the anterior of chest. Dr. Perez also saw mild edema in Plaintiff's lower left extremity, but he prevented Dr. Perez from completing the examination. (*Id.*) Dr. Perez diagnosed unspecified erythema and recommended a skin punch biopsy. After Dr. Perez explained the procedure, Plaintiff wanted to discuss it with his lawyer first. Dr. Perez advised it might take time to get on the dermatologist's schedule, but Plaintiff declined further evaluation. Without physical examination, Dr. Perez could not determine whether Flexeril or Baclofen was the best agent. (*Id.*) Dr. Perez referred Plaintiff to dermatology on a routine basis. (*Id.* p. 187.) The dermatologist's schedule would govern when Plaintiff could be seen. (Ex. 1, Dr. Perez Aff. ¶ 52.)

On October 8, 2014, Plaintiff reported to NP Berumen that Flexeril did not resolve his chronic pain; he wanted to restart Baclofen. Plaintiff also wanted an afternoon snack, a cotton blanket, and an extra towel to exercise his left foot. (Ex. 1-A, MR p. 28.) NP Berumen noted that Plaintiff had negative muscle atrophy in his leg, normal gait, and a full range of motion; Plaintiff had good capillary refill; and his skin looked appropriate. As Plaintiff reported pain, NP Berumen switched Plaintiff to Dantrium, another muscle relaxer, from Flexeril. (*Id.* pp. 28, 64, 68-70, 159.) But when NP Berumen tried to re-evaluate Plaintiff's condition on October 31, Plaintiff refused and threatened to sue NP Berumen with profane language. (*Id.* p. 27)

On December 4, 2014, NP Walden continued the Elavil prescription. (*Id.* p. 27.) She saw Plaintiff on December 10, 2014. On evaluation, she noted that Plaintiff's face was clear without blemish. Plaintiff requested to speak with Dr. Perez regarding multiple issues, including skin biopsy. After discussing this with DON Rush and HSA Duran, NP Walden deferred the medical issues, including the skin biopsy to Dr. Perez to resolve. She also increased the Dantrium dose at Plaintiff's request and noted to follow up with Plaintiff in one week to assess pain management effectiveness. (*Id.* pp. 26, 143.) Plaintiff remained on Elavil. (*Id.* p. 142.) On follow up a month later, Plaintiff advised NP Walden that his pain was in good control and he did not want any changes to his medication. (*Id.* p. 26.) Plaintiff remained on Elavil. (*Id.* p. 62.)

On February 23, 2015, NP Walden followed up with Plaintiff. He requested an increase in Dantrium due to a recent increase in muscle spasms, the status of the dermatology referral, and a cotton blanket due to wool allergy. (*Id.* p. 25.) NP Walden noted a faint, fine, red, raised pinpoint rash on Plaintiff's chest and neck with blanched areas. She did not see rash on his ankles, face, or arms. NP Walden diagnosed dermatitis and suspected wool allergy despite negative tests, given his fair complexion and the allergy-driven type/appearance of the rash. She noted that Plaintiff's exposed areas would be affected when using a wool blanket. (*Id.*) As a skin biopsy was available in-house, referral to a dermatologist was not indicated. In addition, based on the appearance of mild rash and its allergic cause, NP Walden thought a biopsy was unnecessary. She offered Plaintiff hydrocortisone cream and a trial of cotton blankets. Plaintiff opted for the cotton blanket, but declined steroid cream. NP Walden renewed

the Elavil prescription and increased Dantrium to 100 mg twice a day. (*Id.* pp. 25, 60,

140.) Plaintiff then left DACDC in March of 2015. (Ex. 2-B, p. 42.)

## II.   Argument.

### A. None of the Defendants acted with deliberate indifference to Plaintiff's serious medical needs in violation of the Fourteenth Amendment.

As a pretrial detainee, Plaintiff's constitutional rights arise under the Fourteenth

rather than the Eighth Amendment. Nevertheless, the standard remains the same: a

claim for inadequate medical attention will be successful if the plaintiff shows

"'deliberate indifference to serious medical needs.'" *Estate of Hocker v. Walsh,* 22 F.3d

995, 998 (10th Cir.1994)(quoting *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50

L.Ed.2d 251 (1976)). *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009). But this

standard applies only to the bad actor. There is no vicarious liability under 42 U.S.C. §

1983. *Cox v. Glanz*, 800 F.3d 1231, 1248 (10th Cir. 2015). For a supervisor, a plaintiff

must go farther – beyond the constitutional violation itself – and show that the

supervisor is responsible through creating a policy (or failing to make a policy) that is

the moving force of the constitutional violation. *See id.*; *Bd. of Cty. Comm'rs of Bryan

Cty., Okl. v. Brown*, 520 U.S. 397, 404, (1997).

In this case, Plaintiff blurs the distinction between whether the Defendants

violated his constitutional rights directly through inadequate medical care or through

failures to enact polices to ensure appropriate hiring, credentialing, training, or

supervision which led to the violation of his constitutional rights. Even if the answer is

"both," Plaintiff's claims fail because, from the moment he entered DACDC, the medical

staff provided him timely and effective treatment. On his last medical visit, February 23,

2015, Plaintiff had refused treatment for his nonserious rash and left with analgesic medications he called effective.

This first issue – the mild allergic dermatitis – waxed and waned. Plaintiff argues that the medical providers never identified the cause. But not every twinge in medical care is actionable. *See Sealock v. Colorado*, 218 F.3d 1205, 1210 (10th Cir. 2000). Instead, "[a] medical need is sufficiently serious if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Id.* at 1209 (quotations omitted). With treatment, Plaintiff's rash vanished. Without treatment, the rash also vanished: self-limiting as the emergency room physician determined. Plaintiff himself characterized the rash as merely annoying. He never reported, nor did the providers note, symptoms indicative of a more serious allergic reaction. An episodic, mild, annoying allergic dermatitis for which Plaintiff refused appropriate treatment – anti-steroidal creams, oral antihistamines, and a skin biopsy – without ill effect cannot be considered serious.

This is in line with numerous Courts of Appeals. The Second Circuit rejected a persistent rash as a serious medical need, *Lewal v. Wiley*, 29 F. App'x 26, 29 (2d Cir. 2002), and other Circuits have found mild rashes non-serious. *Tasby v. Cain*, 86 F. App'x 745, 746 (5th Cir. 2004); *Ochs v. Thalacker*, 90 F.3d 293, 298 (8th Cir. 1996); *Norwood v. Miller*, 872 F.2d 429 (9th Cir. 1989)("He was treated at the state prison for both the skin rash and the athlete's foot. The prison physician gave him a s[al]ve which cleared up the skin rash and a can of foot powder which cured the athlete's foot. In his

deposition, the prison physician stated that both conditions are common at the state prison and that neither condition is serious.")

Even if the rash could be considered serious, the medical providers offered Plaintiff appropriate courses of treatment to resolve the allergic reaction. While the inadvertent failure to provide adequate medical care does not rise to a constitutional violation, *Estelle,* 429 U.S. at 105–06, the medical staff's treatment was no failure. They evaluated Plaintiff numerous times and prescribed steroidal creams and oral antihistamines. When Plaintiff complained one cream was insufficient, they offered a stronger type. Dr. Perez offered a skin punch biopsy for a more definitive diagnosis, but Plaintiff refused. Every provider who evaluated Plaintiff's condition, including the emergency room physician, reached the same conclusion: he had a mild allergic reaction.  Plaintiff himself is positive that he experienced a chemical burn, but Dr. Perez has explained why his condition was not consistent with such a diagnosis. His dogged disagreement with the medical providers does not mean they acted with deliberate indifference. *Perkins v. Kansas Dep't of Corr.*, 165 F.3d 803, 811 (10th Cir. 1999).

This analysis is the same for the treatment Plaintiff received for his lower leg: none of the medical providers acted with deliberate indifference to his complaints of pain. In regard to the denial of a theraband, the providers provided him a towel instead. He suffered no injury: Plaintiff did not have atrophy, weakness, or ambulation issues. In addition, the medications addressed the chronic pain. Contrary to his allegations, the medical staff prescribed Plaintiff on Elavil temporarily when he arrived and scheduled him to evaluate his needs. He left the facility before that appointment occurred, but upon return, the medical providers started him on a muscle relaxer and Elavil in a matter of

days. While Plaintiff reports that the nurses occasionally erred dispensing Elavil, a nurse practitioner addressed this with the pharmacy. She also shifted Plaintiff to an equivalent medication, Pamelor, to address supply issues. Plaintiff rejected that as an option and, in fact, contends it violated his constitutional rights. However, the alternative medications the providers prescribed – Pamelor and Flexeril – were equivalent medications. When Plaintiff complained the medications did not work, the medical providers responded by changing the medications again. When he left DACDC, Plaintiff took Elavil and Dantrium with excellent results.

Thus, we have no constitutional violation. Without this, all claims against Corizon, Barela, Rush, and Duran in a supervisory capacity fall apart. Even if his rights were violated, Plaintiff cannot prove any affirmative link between the actions of these Defendants and the unconstitutional action. *Cox v. Glanz*, 800 F.3d 1231, 1248 (10th Cir. 2015). He bases his argument on alleged inadequate hiring, training, credentialing, or supervision, but Plaintiff must also show these Defendants had the requisite state of mind – deliberate indifference – for failing to hire, train, credential, or supervise the medical staff. *See Dodds v. Richardson*, 614 F.3d 1185, 1199 (10th Cir. 2010).

The analysis is straightforward regarding Barela. He relied on Corizon to provide appropriately trained and credentialed medical professionals and supervise them. (Ex. 3, Barela Decl. ¶ 6.) He had no knowledge of any failures to treat dermatologic concerns or chronic pain. (*Id.*) He also had no knowledge that showers at DACDC caused chemical burns or skin irritation. (*Id.* ¶ 5.) Thus, no deliberate indifference on Barela's part. HSA Duran and Dr. Perez both testify that all the medical providers were properly credentialed, trained, and supervised. (Ex. 1, Dr. Perez Decl. ¶¶ 2, 61; Ex. 2,

Duran Decl. ¶¶ 6-9.) Aside from his testimony, Duran authenticated numerous Corizon policies dealing with credentialing, training, and medical treatment. (*Id.* ¶ 18.) Plaintiff cannot come forward with one instance of improper hiring, credentialing, supervision, or training; or that a failure of hiring, credentialing, supervision, or training caused the medical staff to render inadequate care. He also cannot show these Defendants knew of such a risk and failed to act.

### B. Plaintiff cannot succeed in any of his state law claims for negligence, negligence *per se*, or breach of contract.

In regard to the state law claims, Barela falls into a different category from Corizon and the medical providers because he is a public employee protected by sovereign immunity under NMSA § 41-4-4. *See Valdez v. State*, 132 N.M. 667, 672, 54 P.3d 71, 76 (2002). This includes immunity for claims that constitute simple negligence. NMSA § 41-4-12; *Glover v. Gartman*, 899 F. Supp. 2d 1115, 1143 (D.N.M. 2012). Thus, all of Plaintiff's negligence claims, whether *per se* or negligent hiring, credentialing, maintaining the facility, and supervision, constitute simple negligence against Barela. He is immune from suit. In addition, as discussed above, to his knowledge, Corizon was amply qualified to provide medical treatment in the correctional setting.

The medical negligence claims also must fail against the Defendants. The question of whether the medical staff, including the individual defendants Dr. Perez, HSA Duran (a nurse), and DON Tammy Rush, provided the correct course of treatment requires expert testimony. *Richter v. Presbyterian Healthcare Servs.*, 2014-NMCA-056, 326 P.3d 50, 56, *cert. denied* (May 2, 2014), *cert. denied sub nom. Richter v. Presbyterian*, 2014-NMCERT-005, 326 P.3d 1111 (2014)("If the act involves the use of specialized knowledge or skill to make a judgment call as to the appropriate thing to do

or not do, expert testimony will likely be needed to assess the resultant act or failure to act.")

Furthermore, Plaintiff's supervisory claims against Corizon, Duran, and Rush all derive from his central allegation that DACDC medical staff provided subpart medical treatment. Thus, these claims must also fail without expert testimony. *Id.* The question whether the Defendants erred by hiring unqualified medical staff or failed to train them adequately requires the exercise of specialized knowledge to judge what is sufficiently trained and who is sufficiently skilled to render medical care. *Id.* ("If the act involves the use of specialized knowledge or skill to make a judgment call as the appropriate thing to do or not do, expert testimony will likely be needed to assess the resultant act....") Putting this aside, even if the standard is ordinary care, Duran and Dr. Perez have testified that everyone was appropriately credentialed and trained. Dr. Perez also swore all the medical staff acted within the standard of care. (Ex. 1, Dr. Perez Aff. ¶ 61.) These claims must also fail.

Finally, Plaintiff cannot recover under a theory of negligence *per se* for a violation of NMSA § 61-6-15(D). Under this section, a licensing board may strip the license of a medical professional for "[u]nprofessional or dishonorable conduct." NMSA § 61-6-15(D). Plaintiff contends that Corizon, Barela, Rush, and Duran employed medical providers who engaged in such conduct, although none of the facts support this allegation. None of the medical professionals engaged in unprofessional or dishonorable conduct. *See Heath v. La Mariana Apartments*, 143 N.M. 657, 659, 180 P.3d 664, 666 (2008)(addressing negligence *per se*). In addition, the statute directs the relevant board to act. Corizon, Barela, Rush, or Duran are not board members and did

not fail to strip unworthy professionals of their licenses. Looked at differently, Plaintiff is restating a negligent credentialing claim – that these Defendants ought to have known the medical providers were not validly licensed under NMSA § 61-6-15(D) and failed to act. However, the medical staff members were appropriately credentialed. Barela is immune to such a claim under NMSA § 41-4-12 as well.

This leads to the final claim – breach of contract – which fails on many grounds. First, Plaintiff is not a party to the contract. Unless one is an intended third-party beneficiary, a nonparty cannot sue to enforce a contract. *Thompson v. Potter*, 2012-NMCA-014, 268 P.3d 57, 61 (2011). The contract between Corizon Health and Dona Aña County specifically rejects that the contract was intended to give rights to third parties such as Plaintiff. *Id.* at 62; Ex. 2-O, Contract, Art. 22. Barela is not a party to the contract either, so he cannot be sued, in his personal capacity, for breaching it. This claim also must fail.

## CONCLUSION

WHEREFORE, Defendants state that based on this *Martinez* Report, the Plaintiff does not have claims on which he can succeed.

Respectfully Submitted,

CHAPMAN AND CHARLEBOIS, P.C.

*/s/Nicole M. Charlebois*
P. O. Box 92438
Albuquerque, NM 87199
505-242-6000
nicole@cclawnm.com
*Counsel for Defendants Corizon, LLC, Jason Duran, Tammy Rush and Dr. Claudio Perez*

**CERTIFICATE OF SERVICE**

I hereby certify that on November_____, 2016, I filed the foregoing electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

I further certify that a true and correct copy of the foregoing was mailed to the non-ECF registered interested party as follows:

Mark Staake #59949
Guadalupe County Correctional Facility
P. O. Box 520
Santa Rosa, NM  88435


Electronically Filed,

/s/ Nicole M. Charlebois_____
Nicole M. Charlebois